Our next argument today is 2023-30085 Holy Cross College v. D.N. Criswell, et al. So Mr. Williams, you may proceed, sir. Thank you, Judge Elrod. Jason Williams and Bob Ellis on behalf of Holy Cross. Kelsey Smith, Deputy Solicitor General from the State Attorney General's Office. May it please the Court, Holy Cross High School is a nearly 200-year-old institution that has educated and graduated countless young minds. In 2005, Hurricane Katrina eviscerated the entire school and much of the city of New Orleans. FEMA was dispatched by then-President Bush to help rebuild the city and this learning institution. And they did exactly that. FEMA was boots on the ground. They found a decimated city literally with nothing but the detritus of what was. It was one horrible mud color and smelled like death. FEMA came to the campus. They worked with Holy Cross administrators for months and months to develop a plan to rebuild. They didn't just approve plans. They helped craft these plans. They helped craft the budget for the rebuild. Holy Cross rebuilt the campus based upon that collaborative work and began teaching kids again. So it wasn't a surprise to FEMA that this money was being used for this purpose? FEMA actually played a role? Absolutely. Absolutely, Judge. There are reams and reams of documentation in which Holy Cross had an idea and FEMA had a better idea. And FEMA's other idea was incorporated into the new idea. There were economies of scale in terms of consolidation of buildings. A number of buildings were spread out over the former Knife Ward campus. They were able to build it smarter and build it better and save taxpayer dollars and Holy Cross dollars to consolidate several buildings into one, the Central Services Building. Could you clarify something that I don't quite understand? The $79 million, does Holy Cross still get $79 million, but it just doesn't get the $5 million for this purpose? But it could get the $5 million for something else? Or does the money get reduced? So this is a complete, for lack of a better word, clawback of funds that were previously approved and set aside for this project. So it's down to $74 million now? Yes. And we've been fighting a very aggressive clawback, and that number has been reduced over time and through litigation. But all of these funds, all of the initial funds, were agreed upon and planned by the then-FEMA administrators and the then-Holy Cross administrators. I mean, it's not that – no offense, but Holy Cross is not diverting the money somewhere else and you're getting caught, and so FEMA's taking it back because you misused the funds that they had approved? Excellent question, Judge, and I'm glad you brought it up. There are a number of instances after Hurricane Katrina where FEMA agreed to help rebuild projects, and they came back five years later and there was a hole in the ground. Not a brick was laid on these projects. That's not the situation. Holy Cross actually had a page, several pages, on FEMA's website for a time and were celebrated as the poster child of how to do this right. Not only that, GOSEP from the state was present at all of these meetings as well. And this wasn't two or three meetings to get this project done. This was boots on the ground on the campus looking at where things were going to be built and how they were going to be built. And I would say Ronald Reagan was absolutely right when he said the most terrifying words in the English language are, I'm from the government and I'm here to help, because when you look at what happened here, they were there to help and they did exactly what they were supposed to do. And then ten years later, different president, different FEMA administrators, different students at desk, and they've changed their mind. And Congress has been very, very clear that they should not be allowed to do that because it gives them infinite, limitless abilities to retroactively, one, bankrupt a school and blow up a state's budget in 2024. It seems to me, Mr. Williams, a big part of your argument is that Holy Cross spent $30-something million of its own money in addition to the $79 million. So the total cost of the project is something like $117 million? Correct. And a good bit of your argument is, well, look, to the extent that there were improvements that wouldn't have been appropriate with respect to the FEMA money, we paid for those with our own money, right? That is exactly right. And I think that's an important argument. But you're saying that what FEMA has done here, the clawback of the $4.8 million is arbitrary and capricious. Absolutely. Okay, so I think what you need to show in the record is where is there evidence that shows, yeah, we spent our own money on these, but we didn't spend FEMA money on this, because if there is evidence of that, and I guess no countervailing evidence, then we might have to find arbitrary and capricious. So if I'm just a big record, where can you show me, can you point to me, where on the record do I go to look to find evidence like that? Certainly. There is copious amounts of documentation that shows that the $30 million in additional funds came from donations and loans to pay for all the additional amenities to the new campus. And FEMA has ignored this $30 million. But I would argue and I would even say I don't think they're going to dispute the fact, and they didn't dispute the fact at any court setting that these $30 million were raised independently. The argument was, well, all of the money was put into the same bank account. But there is volumes and volumes of documentation and fundraising goals to get to that $30 million. And, of course, anytime a school or person takes out a loan, there's documentation of the loans that were taken, and we can very clearly show where those funds came from. And the interesting point is – Can Mr. Ellis maybe on rebuttal give us record sites if they're available, readily available? Absolutely, absolutely. And I would just also state that the $30 million, that dollar figure didn't come out of thin air. They were able to figure out what they needed to raise and what they were going to have to take out in terms of loans in order to make up the difference from what was approved by FEMA, which in its very nature is arbitrary and capricious. I guess there's another, to be fair to the federal government, there's another story that one could tell about this, which is, yes, sure, Holy Cross spent the $38 million, but part of the $79 million was itself spent on, I don't know what the term is, inappropriate projects, non-recoverable, I don't know. I guess I need to understand from the evidence which is the true story, I guess. And to be clear, it's typically in the middle. But it was in the middle of those negotiations. And so in terms of – Well, if it's in the middle, then how can we say it's arbitrary and capricious? Well, when I say it was in the middle, in terms of how they reached these dollar figures, there was agreement, there was work. This was not a situation in which – and I don't even think the government is going to argue this today. This wasn't a situation in which Holy Cross came up with a design, came up with a dollar figure, and presented a page or design pages to FEMA to pay for. This was crafted hand in hand at a time when there were no banks, there was no city hall, there were no schools, there were no people. What you're bringing up is another aspect of your argument that I do think is important, and that's what I think of as the reliance part of your argument. You're saying that – I think what you're saying is this was presented all along to FEMA or to somebody at FEMA, I'm not sure who. They were aware of the scope of the parameters of the rebuild, and it was approved along the way. And then there was a sort of a bait and switch, a reversal. Again, I'm going to need to look at the record in detail. If I look at the record, can you – I mean, are you able to point me to the record where I can see that, yeah, these things were being presented to FEMA all along and they knew about it? Yes, and I think Mr. Ellis is pulling up those dates and times, but there wasn't one specific time in which there was presentation and approval. There were a number of small presentations and approvals throughout the months and months of planning of this building. Originally, Holy Cross was located in the Lower Ninth Ward, and this design plan found a new site that would be on higher ground, and there were a number of buildings that Holy Cross could have rebuilt or could have built the same building the way it was built over 100 years ago, but those design concepts were not in line with current building codes. The heating and cooling elements were not even available in 2005, 2006, 2007, and so there were a number of points in which FEMA and Holy Cross saw fit to save taxpayer dollars and Holy Cross dollars by consolidating buildings and consolidating the purpose of buildings. So the Central Service Building, for example, now is a building that does a multitude of things that existed in four buildings previously. So there was an effort to conserve and be frugal and to build something that would serve the same purpose that it did before, but for less of a cost. Does the $4.8 million, which is what we're arguing about, I guess, the $4.8 million, does it focus on any particular building or any particular features of the building? What is the, I guess, I mean, the government will be able to tell me as well, but I guess I'm getting at what's the problem? Where is the problem focused? And so I would argue that the government will absolutely point out different components that are different at the new Holy Cross site than they were at the Ninth Ward site, but those differences are not, it might be the consolidation of four buildings into one building as it existed before. It might be the different cooling system that is used now that is actually more efficient than it was before. There is no one building or one thing that could be deemed as inappropriate or improper. So is it your position then that it was arbitrary and capricious to use a software that they use for other types of projects that are not hand-in-hand like this project that was designed to be different all along and was blessed in the beginning? So it was arbitrary and capricious to use that software that's used just for following up on other types of projects that are not hand-in-hand projects? That's exactly correct, Your Honor. They use RS means to estimate this deobligation. In both of Holy Cross's appeals, FEMA invoked Holy Cross's supposed failure to follow procurement standards for construction contracts to justify the use of that RS means. FEMA, in turn, used RS means estimation to reduce the amount of Holy Cross's eligible reasonable costs and drive up the amount of that deobligation. That use of RS means was completely arbitrary and capricious and did not fit with the plan that had been invoked by FEMA from the very beginning. Arbitrary and capricious, though, is a high standard. It is, and there are four points, I think, that really show the arbitrary and capriciousness. They fail to recognize, one, that Holy Cross itself paid for any so-called improvements to the tune of donations and loans of $30 million. And the APA requires FEMA, at the very least, reasonably consider Holy Cross's repeated evidence and claims showing that these funds were raised, and they've completely ignored it. And I believe it was University of Texas, MD Anderson Cancer Center, that said no post hoc rationalizations offered by the government's counsel can explain that $30 million away. Secondly, they fail to reasonably consider the effects that Hurricane Katrina had on Holy Cross, Holy Cross's ability to comply with procurement regulations. This looked worse than a war zone. There were no banks. There were no financial institutions. There were no hospitals. There were no contractors. Everything was done by triage trailers. So to suggest that this were a normal time and normal procurement processes existed, FEMA admitted that from the very inception of this relationship. They used RS means to estimate deobligation, which Judge Elrod, you just pointed out, as being the improper standard. And they fail to reasonably consider Holy Cross's legitimate decade-old reliance on this interest. They brought this up way after the fact. This school has graduated kids before they begin to start deobligating or asking that it be deobligated. FEMA evaluated estimates, drawings, attended meetings, spoke directly with every contractor that was involved, not just Holy Cross School, every contractor, every architect, every engineer that was involved. FEMA met with them, and without any explanation, a decade later, the same agency but different people in different offices decide to use a general estimator to determine the entire bill should have only cost $900,000 and $900,000, nearly a 75% reduction from what they had agreed upon themselves. This unexplained inconsistency between eligible cost figures before and after construction is the hallmark of arbitrary and capricious. And I believe data marketing partnership was you all's case. Okay, thank you. We have your argument. Thank you, Your Honor. We'll hear now from Mr. Mansfield. May it please the Court. Good morning. Peter Mansfield with the U.S. Attorney's Office here on behalf of defendants, appellees, FEMA, and its official capacity administrator. It's uncontested in this case that FEMA conditionally approved Holy Cross to receive over $80 million in Stafford Act public assistance grant funding to rebuild its flooded campus after Hurricane Katrina. And after a lengthy, interactive, multi-year administrative process, which Holy Cross participated in, FEMA deobligated just a small fraction of that total amount of grant funding on account of ineligible improvements that Holy Cross built on its new campus. After careful review of the thorough and detailed administrative record, the district court correctly concluded two things. First of all, the statutory safe harbor from deobligation in the Stafford Act, Section 5205C, applies only to governmental subgrantee applicants and not to private nonprofits like Holy Cross. And second, that FEMA's deobligation of Stafford Act public assistance grant funding to Holy Cross for those ineligible campus improvements that they built on their new campus did not violate the APA's deferential, Judge Elrod, you said, high, arbitrary, and capricious standard of review. For those reasons, the court should affirm. So can you help with the Stafford Act part? Are you saying that they should never have approved it to begin with? Is that what you're saying? No, it's a bit more nuanced than that. Holy Cross is a private nonprofit. In the statute, the Stafford Act does allow private nonprofits to be subgrantee applicants and eligible recipients of Stafford Act public assistance grant funding because they're an educational institution. So there's no question about Holy Cross's eligibility in the first instance. The deobligation is a much more far down the line analysis, focusing specifically, and I'm going to direct you to page four of our brief, on a line item table of certain architectural features and overbuilds that Holy Cross built on its new campus that were ineligible for Stafford Act public assistance grant funding because they were improvements. Stafford Act grant funding is limited to the amount necessary to rebuild the damaged facility on the basis, I quote, of the design of the facility as it existed before the major disaster. But they knew that the buildings were going to be consolidated and rebuilt, so they couldn't be exactly the same. That is true, but it's still the money does not increase as a result of Holy Cross electing to build improvements, consolidate, and build additional square footage. I thought that was part of what was blessed by FEMA. Is that not true that FEMA said, yes, you really should not spend the money to rebuild back this building. You should consolidate the three buildings or whatever. As part of that, it would have architectural features on the consolidated building, wouldn't it? No. At all points in time when FEMA was approving what's called a project worksheet to obligate federal funding, FEMA is specifically saying the eligible cost will be determined at closeout after the facility is built based on documentation establishing the reasonable cost for the eligible scope of work. And they are specifically saying when project worksheets are approved pre-construction, track your detailed costs because FEMA is statutorily prohibited from paying for improvements. Okay, that's what I'm sorry. Go ahead. No, go ahead. Well, so I'm trying to get at sort of, there's obviously a disagreement about $4.8 million. Correct. Initially it was, I guess just as an aside, OIG initially said it was like $80 million. Eighty-two. Eighty-two. And so FEMA lowered that to eight, seven, eight. 7.9. 7.9. Okay, you know the numbers better than I do. And then now we're at 4.8. Correct. So I guess I want to understand, here a multi-part question. I just want to understand what is the nature of the ineligibility here with respect to the 4.8? And then as you explain that, it seems to me that Holy Cross has two major defenses to that, which is, well, anything that was ineligible we paid for with our own money. And then the second part is, and you already approved what you're now saying is ineligible. You approved it, and so we relied on that, and now you're saying it's ineligible. That's just my rough and sort of rough approximation of what's going on here. So to the extent that's a question, that's my question. I understand. So let's go to page four of the table of the brief that FEMA provided, providing 11 line items. They say were ineligible improvements, most of which are architectural features, but there's one big line item. The big ticket item is the Central Services Building. It's called Central Plant, line 11. So these are the specific features, and I'm going to go ahead and jump into the question about, did Holy Cross spend its own money to build these 11 items? And the answer is no. These 11 items, the reason FEMA was able to identify them with this level of specificity is because they appeared on pay applications for federal money. This is a critical distinction. Holy Cross has been talking about private money, going back to the administrative process. This is really just a straw man argument because at the end of the day, what this case is about, this case in controversy, is a cost accounting for federal grant money. If these things have already been spent using private money, then where is the harm when FEMA deobligates federal money? There can't be double recovery or a duplication of benefits. So, again, for an at-cost replacement project, federal grant funding is limited to the design of the facility as it existed before the major disaster. That's 42 U.S.C. 5172. These 11 items were not on Holy Cross's damaged, flooded 94 campus. So, Mr. Manfield, let me just understand what you're saying. I'm looking at page 4. I'm looking at item 11. That looks like the biggest item, central plant shell. Central services building. Okay, that's a central services building, 3,202,167. What I hear you saying is this was on a sort of – Holy Cross was effectively saying to FEMA, well, we need reimbursement for this, and that implies or that necessary implication of that is we didn't pay for that with our own funds. Correct. Okay. No, that's exactly correct, that they are seeking federal money for this amount that FEMA is deobligating. Now, this table came from the initial audit response, and that goes back to the number. When FEMA decided it's not going to be an $82 million deobligation based on, let's just call it technical procurement violations, they didn't include certain terms in their construction contracts. The OIG took a very draconian view of that and said you probably should deobligate all $82 million. The problem was they had already built their new campus. That would have been an incredibly harsh result, and if I was here before you on an $82 million deobligation, I'd have a much different, much more difficult argument. So FEMA, in its audit response to OIG, says the vast majority of that $82 constituted reasonable costs. It was properly spent, and it doesn't seem like they were overspending or paying above what the market would suggest was a reasonable cost. That being the case, we are seeing ineligible costs on their pay applications for federal money. As a matter of the statutory mandate of the Stafford Act, we cannot pay these things. They are ineligible for grant funding. Does it matter whether they were – I know it says on the thing that they can be rejected, but if they were planned on by the FEMA people to begin with, that FEMA said this is what you should do, and then they're doing that exact thing, and then FEMA's then using its more strict methodology later. Does it matter? Can you be a stop? Can FEMA be a stop in any way, maybe not legally, but in some way that would affect arbitrary and capricious review? If any FEMA employee was making representations that we can and we will pay for campus improvements, that would be in stark violation of the statutory mandate of all survivors. Instead, you can do this building, and this building can look like this, and we bless the plans. There's no record evidence supporting that. In fact, the record evidence is the exact contrary. Page 28 of my brief, we cite some examples. Going back to 2009, when these project worksheets are first being approved for federal funding, and FEMA's advising Holy Cross that the funding of this project is limited to reasonable costs for the eligible scope of work. We can only pay for what the statute allows us to pay. So it warns Holy Cross, any improvements that go beyond the eligible scope may be subject to capped costs. In other words, you can't just submit your actual costs to build improvements. We're going to cap it at only the reasonable cost for the eligible scope of work. FEMA warned Holy Cross in 2009, track your improvements. The reason is because the improvements are the responsibility of Holy Cross, and this is a key sentence, if the improvements are not identifiable, in other words, if you don't segregate out what's an improvement versus what's an eligible replacement, we're going to be capping your costs. And what they did, and this gets to your question about RS means, in the administrative appeals, when Holy Cross and FEMA are reviewing what's an improvement, what's not, and what's a reasonable cost for the eligible scope of work, they asked Holy Cross, you were approved for an eligible scope of work. You've clearly overbuilt. You've built improvements. The central services building is like 50% bigger than it was in the Ninth Ward. It was basically a glorified utility garage where they serviced buses in the Ninth Ward. Now it's like a focal point of campus with classrooms and locker rooms and coaches' offices. It's bigger in square footage. It's bigger in functionality. That's because they don't have the other space anymore. They could have built whatever. Well, true, they relocated from the Ninth Ward. And with the blessing of FEMA. The relocation was approved. But again, the federal funding is still limited to rebuild what existed on your prior campus footprint. But they were saving FEMA money by not rebuilding that other part, weren't they? I don't know if it would have been more cost effective to rebuild the Ninth Ward versus Gentilly. I know the Ninth Ward was flooded so badly with three feet of standing water that it was impractical to rebuild. Which is why FEMA blessed this, even though it would spruce it up some. They did bless the relocation, and they obligated in excess of $80 million to build five campus buildings. We are talking about deobligation of about 5% or 6%, because Holy Cross couldn't tell FEMA how much it costs them to rebuild eligible projects. And they didn't segregate out the ineligible improvements versus the eligible replacements. Generally, what kind of reasonable reliance interest does a recipient of these funds have based on these initial approvals along the way? Well, they can reasonably rely that they are going to receive FEMA grant funding for reasonable costs specifically correlated to the eligible scope of work and proven up by actual documentation of costs. And indeed, that's what they receive to the tune of $70-something million. For a private nonprofit like Holy Cross, the specter of audit and deobligation, is that sort of hanging out there in perpetuity? Yes, until project closeout. Project closeout is when everything is reconciled. It's after the project is built, and there's an opportunity to look at all of the supporting documentation, segregate out what's ineligible versus what's eligible. And that's when the final determination of the amount of payment that will be made is actual. So when closeout occurs, that's kind of the end point, and there's no longer any lingering specter of audit or deobligation beyond that? I believe the CFR says an audit can occur after closeout, and if ineligibilities or some other problem appears, it can be deobligated after closeout. But that's not the case in what we're dealing with here. Can it be done in 25 years, 100 years? It seems practically unlikely that would occur. Maybe there's a latches argument. I don't know. But let's look at the timeline. I don't think you can get latches against the federal government. Can you? I don't believe you can. So 25, 100 years. Any time they want in perpetuity, they can come back, no matter what they said in the past? Well, that would be an extreme hypothet. Don't fight the hypo. Just do your best to answer it. You're forcing me into a concession. I'm going to make it because I think that's what the regulation says. But I want to quickly pivot back to the timeline of this case because that's much better for me. And that is that the OIG audit occurred from 2012 to 2015. FEMA responded to the OIG in 2017. The project closeout occurred in 2019. Holy Cross's two administrative appeals were in 2020 and in 2021. So we have a nice orderly sequence of audits. So this was not that extreme case, but you believe the government can do what it wants in that regard? In terms of deobligating federal grant funding for ineligible improvements, yes. But that's not because we take an overly aggressive view or too expansive of a view of government power. It's because it's what Congress said. It's in the Stafford Act. This is 5172. For an at-cost replacement project, it is limited to the design and the function of the pre-disaster facility that you're replacing. Just a quick question about the robustness of the district court's order in this case. It is not very robust on the numbers, and it seems to say, well, it's just a small percentage, and therefore it's good. Perhaps I'm missing some key language in the order. I'm not criticizing the district court, but do we need to remand for the district court to do a more thorough regents-type review in this case, as the state of Louisiana argues in its brief? Absolutely not. Absolutely not. The district court got this one right. Look, it was only going to respond to the arguments that Holy Cross made, and it appreciated four of them, and we've identified most of them here. Holy Cross used its own money. District court addressed that. Exigent circumstances justify ineligible improvements. District court addressed that. The central services shell, you de-obligated too much. RS Means was too heavy-handed. You should have used a proportionality model. District court addressed that. The fact that Holy Cross had support from the state grantee in the state of Louisiana, who's the amicus now, district court addressed that, and that statutory safe harbor from de-obligation, which is more a pure issue of statutory interpretation. District court addressed that. Citations to the administrative record throughout that opinion. So we appreciate. APA review is not a rubber stamp. It's not toothless. Maybe it has serious bite now. This court has used that phrase before, but whatever dental analogy you want to use, this particular opinion from Judge Fallon satisfied it, and there's really nothing more he can do. Remand would not be appropriate, and let's bring up Holy Cross. That was a dental analogy, didn't you? Serious bite. It's not toothless. It's a dental serious bite versus toothless. It's got my teeth on edge. Go ahead. I think I lost my train of thought. I'm sorry. Holy Cross filed a motion for new trial, a Rule 59 motion. I think one of the first questions that was raised was, and I think you invited Mr. Ellis to address this on rebuttal, did you ever show the breakdown of where you spent your private money? That was precisely the issue Holy Cross brought in its motion for new trial. The district court addressed that and rejected it, saying, you've only produced a couple documents from the administrative record, and I quote, they raise more questions than they answer, and at the end of the day they do not satisfy your obligation to show that somehow my initial opinion on summary judgment was incorrect, nor do they establish what the breakdown was between your private money versus the federal money. The district court, again, addressed every argument that Holy Cross raised. Each one of the district court's findings are cited to and rooted in the administrative record, which of course is the universe of what the district court is going to review. The state amicus brief cites a lot of the things that are not in the administrative record. That's totally irrelevant. I don't need to educate the panel on the scope of APA review. This is a highly deferential standard of review. The statute has not been amended, so it's not a rubber stamp, but again, the agency, its proceedings are entitled to a presumption of rationality. You're looking for a decision that's both reasonable and reasonably explained. That's a phrase the court has used in some recent APA cases. The district court's opinion satisfies that standard. FEMA's audit response, its decision on the first administrative appeal, on the second administrative appeal, reasonable and reasonably explained. The district court correctly granted summary judgment in favor of FEMA after a careful review of the administrative record. If there's no further questions from the court, we would urge the court to affirm. Thank you. Thank you. Good morning, Your Honors. Bob Ellis. First of all, I'd like to drill down on some issues. If we're going to go with dental analogies, I can't imagine a better one when you're talking about FEMA because it's been about that for my client. Completely painful the whole time. To address your question specifically, Judge Elridge, we, in administrative record at 82, we provided a spreadsheet with a cost breakdown of all the money we spent. That evidence is not refuted at all by FEMA. We have an affidavit by Brian Williams, the CFO of Holy Cross. That's at record 908. You have the affidavit of Dean DePleche, the architect engineer, graduate of Holy Cross, 101 and 100 to 101. Can we use, can FEMA say affidavits are not good enough, we need receipts? Your Honor, they asked for those receipts a decade after the fact. But going back to the record at 4849 to 4861 is PW13136, which version 5 dated. It is a record that demonstrates that on May 11, 2009, FEMA knew about the enlarged building, the central services building. Now, it's important because FEMA says, we didn't know you were going to build it. But it's right there in their records, not ours. Their person. And then in 4857 to 4860, an analysis by GOSEP, Lynn Browning says, we know that the building was going to be expanded. You knew the building was going to be expanded. We knew how much it cost, and they paid for it. That's the state's record. So when FEMA tries to play like they didn't understand or they didn't know, that's disingenuous. And the problem is FEMA is a revolving door. We've gone through so many different individuals, we don't even know who we deal with anymore. Mr. Williams and I met with him in D.C. before the first appeal. That person has been removed three times over now. And they lack consistency, because it's like there's no transfer of institutional wisdom. One makes a decision, but the next one doesn't have to follow it because they have wide discretion, which I now believe it can't be of any consequence. In wages and wine case, your case, which talks about serious bite, the APA requires FEMA, at the very least, to reasonably consider. There is not one iota of documentation that FEMA looked at our contention that we spent our own money, not one, not a single record. They disregarded it the entire time. We had multiple Zoom meetings with them. They could Q&A our people. We gave them all the records we have. They just never considered it. And the district court didn't either. He said in his original district court opinion, he said only if you would have done this. And I'm like, Exhibit G, sir. Exhibit G, it's in there. We had to go file a motion for reconsideration. He's like, well, that raises more questions than it answers. Well, then in that case, in summary judgment, it's not appropriate. We'd have to go back and review evidence. That's the question. That is the problem with his opinion on the motion for reconsideration. We agree with FEMA on one aspect. We think this court can reverse and doesn't need to remand because the record's clear. They did arbitrarily and capriciously de-obligate money. Remember, they started at $82 million. We're down to $4.9 million. But they want us to pay for it. They want Holy Cross to pay for it. Well, here's the problem they end up with. Under the Stafford Act 5205C, the state of Louisiana is who they would have to go back to get the money from. But they're protected under 5205OC. They're protected. The FEMA cannot get money from the state of Louisiana. When GOSEP called Holy Cross asking for the money back, we said, we don't have it because we spent it. And you know we spent it because you're with us. And we don't have it. And you know what? We can't make us pay, which is why the state of Louisiana filed an amicus brief saying, this could really disrupt our coffers because now FEMA's expecting us to pay. And in the district court's opinion, when he analyzed 5205, he said, if it doesn't lead to absurd consequences, I have to go with what it says. This is an absurd consequence because you're asking for money back that we spent. Your record shows we spent it. Our people, our individuals who have been there the whole time say you spent it. And now you've got GOSEP who did its own analysis, who looked at it, and in the PW say we know that Holy Cross spent the money and we didn't pay for it. It's just unbelievable that FEMA continues to come after Holy Cross after all these years. I guess that was one other question Judge Elrod asked about. To be clear, the money's all spent. We don't have any of it because as it came in, we spent it. And then we used our own funds to facilitate it. And the reason the Central Service Building that they talk about, if you look at the PW and the record I just indicated, if I could just finish for one minute, it states that the building was a shell to accommodate Holy Cross to go in and replace buildings that it had lost. So in other words, the bottom floor is a complete shell. So they were going to repurpose what I call a warehouse into classrooms and the gym. So in conclusion, Your Honors, we think that the matter needs to be reversed. We don't think it needs to be remanded. But if you don't feel it can be reversed, then please reverse and remand it for further evidentiary procedure with regard to the expenditures. Thank you, Your Honors. Thank you. We appreciate the arguments of Mr. Williams, Mr. Ellis, and Mr. Mansfield. Very good arguments all around.  Thank you, Your Honors.